UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


NATHAN A. GARNER,

      Plaintiff,                    Civil Action No. 14-10990

          v.                  District Judge DAVID M. LAWSON
                                Magistrate Judge R. STEVEN WHALEN


COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

     Plaintiff Nathan A. Garner ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner ("Defendant").   Plaintiff, previously found disabled  as of January 4, 2004, disputes Defendant's decision that he was no longer disabled as of May 1, 2010 (Tr. 137).   The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).   For the reasons discussed below,  I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be  DENIED.

## PROCEDURAL HISTORY

     On April 14, 2004, Plaintiff was found disabled as of January 4, 2004 (Tr. 135-136).

Defendant later determined that Plaintiff was no longer disabled as of May 1, 2010 (Tr. 137). Plaintiff then requested an administrative hearing, held on September 17, 2012 in Flint, Michigan before Administrative Law Judge ("ALJ") John Ransom (Tr. 110). Plaintiff, represented by Richard Wagner, testified (Tr. 113-131), as did Vocational Expert ("VE") Timothy Shaner (Tr. 132-133). On October 18, 2012, ALJ Ransom found that Plaintiff's disability ended on May 1, 2010 (Tr. 85-96). On February 7, 2014, the Appeals Council denied review (Tr. 1-6). The Appeals Council correspondence noted that Plaintiff had submitted a number of records created after the October 18, 2012 administrative decision, but declined to consider them because they were not relevant to whether Plaintiff was disabled on or before October 18, 2012 (Tr. 2, 7-75). The Appeals Council added to the record other newly submitted records which were created before or shortly after the October 18, 2012 decision (Tr. 804-898). Plaintiff filed suit in this Court on March 6, 2014.

## BACKGROUND FACTS

Plaintiff, born September 30, 1961, was 51 when ALJ Ransom issued his decision (Tr. 96, 246). He completed 12th grade and was found disabled as of January 4, 2004 due to cardiomyopathy (Tr. 90, 257). He alleges continuing disability due to shortness of breath and syncope (dizziness) (Tr. 267).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

He lived in a single-family home with his mother and sister (Tr. 113-114). He held

-2-

a valid driver's license but did not drive due to intermittent "blurry vision" and headaches (Tr. 114-115). He relied on his mother or sister for rides (Tr. 114-115). He had been diagnosed with glaucoma and was currently prescribed medication for the condition (Tr. 115). He experienced vision problems approximately once a week (Tr. 115-116). He last worked as a dish washer, estimating that he had last worked in 2009 (Tr. 117). He was unable to perform that job at present due to foot problems (Tr. 117). He was unable to perform even the work of a surveillance monitor due to right knee edema and a swollen abdomen (Tr. 118). As a result of the extra abdominal weight, he experienced shortness of breath and fatigue (Tr. 119). Diuretics gave him only temporary relief (Tr. 119). He did not use tobacco or alcohol (Tr. 120). He also experienced chronic headaches and chest pain, noting that on a scale of 1 to 10, he experienced level 7 pain most of the time (Tr. 120). He experienced severe chest pain approximately three times a week, adding that he had taken a nitroglycerin pill the previous month (Tr. 121).

Plaintiff was unable to sit or stand for more than 10 minutes at a time (Tr. 122). He was unable to lift more than five pounds (Tr. 122). He was unable to lift even a gallon of milk, noting that he relied on his mother or sister for help (Tr. 122). Nonetheless, his heart condition had improved since 2004 (Tr. 124-125). He had passed out three times in the past year and experienced constant dizziness (Tr. 125). He also experienced gastroesophageal reflux disease ("GERD") (Tr. 127). He obtained only short-term relief from antacids (Tr. 127). He had been diagnosed with sleep apnea but obtained good results with a CPAP

-3-

machine (Tr. 127).  He relied on his mother and sister to perform the household chores and

to remind him to take his medicine (Tr. 128).  His four adult children performed the yard

chores (Tr. 128).

**B.    Medical Evidence**[1]

**1. Treating Records**

January, 2004 hospital records note a diagnosis of alcoholic liver disease, cirrhosis,

"history of congestive heart failure," and hypertension (Tr. 318).  He was diagnosed with

severe non-ischemic cardiomyopathy (Tr.  318).

In March, 2009, cardiologist Hameem Changezi, M.D. noted that the cardiomyopathy

had "resolved" (Tr. 330).   Plaintiff was encouraged to exercise and quit smoking (Tr. 330).

The following month, Plaintiff reported dizziness upon bending (Tr. 329).  Dr. Changezi

reduced Plaintiff's dosage of Carvedilol (Tr. 328).  In August, 2009, Plaintiff reported that

he was sweeping the floor when he passed out for two to three minutes (Tr. 379).  Plaintiff

reported periodic dizziness which "only happen[ed] when he trie[d] to stand up after bending

over" (Tr. 327).  Treating records from later the same month note that the fainting episode

was "probably secondary to dehydration" (Tr. 375, 377).  In September, 2009, Plaintiff

reported "still some dizziness when going from sitting to standing" (Tr. 325).  EKG testing

---

[1]

Plaintiff concedes that the condition of cardiomyopathy which formed the basis of the 2004 disability determination has "significantly improved." *Plaintiff's Brief* at 12, *Docket #16.* The evidence from 2004 is discussed for background purposes only.  Treatment records for conditions unrelated to the present claim for ongoing disability have been reviewed but are omitted from the present discussion.

was negative for abnormalitites (Tr. 379). Holter Monitor testing showed "mild" tachycardia (Tr. 320).  He was advised to "get up slowly" and "drink plenty of fluids" (Tr. 373). Followup notes by Dr. Changezi  state that Plaintiff was "doing well and [was] clinically stable" (Tr. 323).  Dr. Changezi noted that Plaintiff was "physically active" (Tr. 323). Plaintiff reported that he experienced the side effect of "flushing" from Niaspan (Tr. 323).

A February 10, 2010 ophthalmological exam noted "glaucoma suspect," and the need for reading glasses (Tr. 347).  Testing was negative for retinopathy (Tr. 355).  A chest x-ray from the same month showed "no active disease" (Tr. 384, 734).  The following month, Plaintiff reported episodes of dizziness that resolved "within a few seconds" (Tr. 366).  He denied losing consciousness (Tr. 366).  A May, 2010 examination by Edward Holden, M.D. was negative for shortness of breath (Tr. 425).

June, 2010 ophthalomogical records again state suspected glaucoma (Tr. 408). Plaintiff was advised to restart Lumigan (Tr. 408).  A cardiac stress test performed the same month was inconclusive due to the failure to "achieve target heart rate" (Tr. 416).  Plaintiff reported abdominal swelling the same month (Tr. 423).  A chest x-ray was unremarkable (Tr. 427, 536).  Dr. Changezi's September, 2010 treating records state that Plaintiff was adamant that he continued to experience cardiomyopathy, despite objective testing showing otherwise (Tr. 448).  Plaintiff indicated that he wanted a second opinion, but "wanted to . . . check around and find out for himself whom he want[ed] to go to" (Tr. 448).  The following month, gastroenterologist Glen Henbest, D.O. noted a "softly distended" abdomen (Tr. 456).  He

noted that the distention could be attributable to the use of diuretics (Tr. 457). A November, 2010 colonoscopy showed mild internal hemorrhoids but no other abnormalities (Tr. 458). An ultrasound of the abdomen showed a slightly enlarged liver (Tr. 460). Cardiologist Syed L.Ahmed, M.D. noted an unremarkable physical examination (Tr. 470).

In March, 2011 Dr. Ahmed stated that Plaintiff was bloated because he was "not watching his salt" (Tr. 467). An echocardiogram showed unremarkable results (Tr. 482). The following month, a myocardial perfusion study was negative (Tr. 485). In May, 2011, Plaintiff alleged fainting from both a standing and sitting position but denied headaches (Tr. 475). He also alleged edema (Tr. 475). An examination was unremarkable (Tr. 476). Dr. Ahmed recommended a low salt diet and requested a followup appointment in six months (Tr. 476). August, 2011 treating records by the University of Michigan Gastroenterology Clinic note a normal ultrasound of the liver (Tr. 619, 641). Plaintiff reported that he lived with his fiancée (Tr. 620). Imaging studies of the heart were unremarkable (Tr. 645). Imaging studies of the right knee were also unremarkable (Tr. 784). In October, 2011, cardiologist Michael J. Shea, M.D. noted the absence of active heart disease (Tr. 625-626). Dr. Ahmed noted Plaintiff's claim that he had not experienced "new episodes of syncope or collapse" (Tr. 771).

In February, 2012, Dr. Shea stated that the presence of abdominal distention was attributable to the sporadic use of diuretics (Tr. 633). In March, 2012, Khaled Shukairy, M.D. noted Plaintiff's reports of ongoing "unsteadiness, fogginess, imbalance

lightheadedness, [and] loss of balance" (Tr. 557). Plaintiff reported that the dizziness lasted for about two seconds (Tr. 567). A CT scan of the sinuses was negative (Tr. 560, 573). An echocardiogram showed only mildly abnormal findings (Tr. 790). The following month, a sleep study showed reduced symptoms of sleep apnea with the use of a CPAP machine (Tr. 576). Plaintiff was advised to lose weight and exercise (Tr. 577). Ophthalmological records show that Plaintiff experienced 20/20 corrected vision (Tr. 579). In May, 2012 Pratima Sharma, M.D. noted an unremarkable physical examination (Tr. 635). The same month, treating records note a recent diagnosis of a blood disorder hindering the ability to clot (von Willebrand Disease) (Tr. 781, 797). A June, 2012 ultrasound showed a fatty liver but no other abnormalities (Tr. 643). A June, 2012 MRA of the brain was negative for "significant stenosis, aneurysm, or arteriovenous malformation" (Tr. 723). An MRI of the brain was negative for "acute infarct or abnormal masses" but showed the possible presence of "hypertensive arterioscherosis" (Tr. 724-725, 788-789). An EEG was normal (Tr. 721). An ultrasound of the carotid artery was also negative (Tr. 786).

## 2. Non-Treating Records

In May, 2010, R. H. Digby, M.D. performed a physical Residual Functional Capacity Assessment on behalf of the SSA, finding that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for about six hours in an eight-hour workday; and push and pull without limitation (Tr. 400). Dr. Digby found that Plaintiff was limited to occasional postural activities (Tr. 401). He found the absence of manipulative, visual, or communicative

limitations but determined that Plaintiff should avoid concentrated exposure to extreme cold (Tr. 403).

A July, 2010 physical Residual Functional Capacity by Russell Holmes, M.D. found that Plaintiff could lift 20 pounds occasionally and 10 frequently; sit for six hours in an eight-hour day and stand/walk for two; and push and pull without limitation (Tr. 435). Dr. Holmes found that Plaintiff could balance, stoop, kneel, and crawl on a frequent basis and climb and crouch on an occasional basis (Tr. 436). Dr. Holmes found that Plaintiff should avoid concentrated temperature extremes and fumes with only rare exposure to hazards (Tr. 438). Dr. Holmes concluded that Plaintiff's "self described physical limitations" were "not fully credible" and were unsupported by objective testing (Tr. 439).

### 3. Evidence Submitted After the ALJ's October 18, 2012 Decision[2]

A June, 2012 x-ray of the right knee showed a "small effusion" (Tr. 810). July, 2012 treating records note that Plaintiff was "well-appearing" and "in no acute distress" (Tr. 832, 844). An x-ray of the cervical spine showed degenerative changes but good alignment (Tr. 847). An x-ray of the left shoulder was normal (Tr. 848). An August, 2012 EMG of the

---

[2]

Evidence duplicating the material considered by the ALJ is omitted from mention. Pursuant to the sixth sentence of 42 U.S.C. § 405(g), the new evidence can be considered as a basis for remand provided that a claimant show both the materiality of the new evidence to the ALJ's determination *and* "good cause" for its tardy submission. *Id.* Plaintiff does not cite any of the newly submitted material in support of his Motion for Summary Judgment. My own review of the newer evidence shows that it does not provide a basis for remand.

lower limbs was unremarkable (Tr. 813).   August and September, 2012, treating records state that Plaintiff experienced chronic neck and back pain (Tr. 809, 823).  He demonstrated a "good range of back motion" and no acute distress (Tr. 821).  He was referred for physical therapy  (Tr. 823).   Plaintiff reported that in the presence of his fiancée, he "passed out" while watching television on the couch (Tr. 825).  Examination notes state that his abdomen was "nondistended" (Tr. 821).   An x-ray of the lumbar spine showed only "minimal" degenerative changes (Tr. 846).   He demonstrated normal muscle strength (Tr. 825).  He obtained a handicap sticker for his car (Tr. 878).  Therapy discharge notes from the following month state that Plaintiff experienced "improved flexibility" (Tr. 865).  In November, 2012, Plaintiff underwent an abdominal fat pad biopsy (Tr. 880).  The surgery was negative for amyloidosis (Tr. 889).

On February 18, 2013, a treating source completed a medical source statement for state benefits, stating that Plaintiff was limited to lifting less than 10 pounds, sitting less than six hours, and standing/walking for less than two in an eight-hour period (Tr. 806).

## C.  Vocational Expert Testimony

VE Timothy Shaner  classified Plaintiff's prior work as a dishwasher as unskilled at the light level of exertion[3]  (Tr. 132).   The VE stated that if Plaintiff's testimony were fully

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that

credited, he would not be able to work due to frequent dizzy spells which would take him off

task (Tr. 132).  The VE found that if Plaintiff were limited to work "where he would not have

to work around unprotected heights or moving machinery; no prolonged walking, standing

or lifting," with a restriction to "low stress work," he would be capable of performing the

jobs of assembler (4,500 positions in the regional economy) and inspector (1,600) (Tr. 133).

The VE stated that his testimony was consistent with the information found in *The*

*Dictionary of Occupational Titles* ("*DOT*") (Tr. 133).   In response to questioning by

Plaintiff's attorney, the VE testified that he would be unable to identify a vocational modifier

which would address  a blood clotting disorder (Tr. 133).

### D.    The ALJ's Decision

Citing the April 14, 2004 comparison point decision ("CPD"), the ALJ found that

Plaintiff previously experienced the severe impairments of "cardiomyopathy" but as of May

1, 2010, the disability ended (Tr. 90).  He found that Plaintiff currently experienced the

severe impairments of "history of cardiomyopathy, diabetes, hypertension and obstructive

sleep apnea" but that none of the conditions met or medically equaled an impairment listed

in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 90).  ALJ Ransom found that as of May

1, 2010, Plaintiff had the following residual functional capacity ("RFC") for exertionally

---

exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent
lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting
objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects
weighing 50 pounds or more. § 404.1567(e).

light work with the following additional impairments:

> [N]o work at unprotected heights or around moving machinery, with no prolonged walking, standing or lifting in a low stress working environment (due to his history of coronary disease)(Tr. 91).

Citing the VE's testimony, the ALJ found that Plaintiff could work as an assembler and inspector (Tr. 95). The ALJ noted that Plaintiff's allegations of ongoing disability were undermined by June, 2012 imaging studies showing "normal" results (Tr. 94). The ALJ observed that an April, 2012 eye exam noted only "suspected" glaucoma and mild retinopathy (Tr. 94). He cited the treating cardiologist's finding that the condition of cardiomyopathy "had now been resolved" (Tr. 92).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-12-

## ANALYSIS

### A.   A Medical Improvement

Plaintiff argues that the finding that he was no longer disabled as of May 1, 2010 reflects an incomplete and erroneous review of the medical records. *Plaintiff's Brief* at 12-18, *Docket #16.*  He concedes that the condition of cardiomyopathy which formed the basis of the 2004 disability finding has resolved. *Id.* at 12.   However, he contends that the ALJ disregarded evidence from 2009 forward supporting the allegations of syncopal episodes and abdominal distention. *Id.* at 12-15.   He also argues that the ALJ failed to address Dr. Holmes' July, 2010 non-examining Residual Functional Capacity Assessment. *Id.* at 16-18.

In contrast to an initial disability determination, "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Kennedy v. Astrue,* 247 Fed.Appx. 761, 765, 2007 WL 2669153, *4 (6th Cir. September 7, 2007)(*citing Griego v. Sullivan,* 940 F.2d 942, 944 (5th Cir.1991)).   In a cessation of benefits case, "the central question is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity." *Kennedy* at 764; 42 U.S.C. § 423(f)(1).   A "medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement must be supported by an improvement "in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.*; *Kennedy* at 765.   Aside from

-13-

the "medical improvement" requirement, Commissioner must  show that the previously disabled Plaintiff is capable of performing substantial gainful activity.  *See* "Framework for Disability Determinations," *above*; *Kennedy* at 765; 20 C.F.R. § 404.1594(b)(5) and (f)(7).

### A.  The Alleged Syncopal Episodes

The ALJ did not err in rejecting Plaintiff's alleged degree of limitation as a result of syncopal episodes.  As noted by the the ALJ, none of cardiological and neurological testing performed in response to Plaintiff's complaints provided an explanation for the claims of chronic dizziness (Tr. 92-94).  The ALJ correctly noted that in August, 2009, an EKG was normal and a September, 2009 Holter monitor testing was "essentially normal" (Tr. 92).  He noted that a February, 2010 chest x-ray and pulmonary testing was also normal (Tr. 92).  He observed that a January, 2011 ultrasound of the liver showed a "slightly enlarged liver" and that in February, 2011, EKG and echocardiogram testing was normal (Tr. 92).  The ALJ noted that March and April cardiological testing was also normal (Tr. 92).  He characterized the June, 2012 MRA and  MRI of the brain as normal (Tr. 93).

Plaintiff faults the ALJ for finding that the MRA and MRI of the brain were "normal." *Plaintiff's Brief* at 14.  He notes that the studies showed the posibility of a "prior microhemorrhage" (MRA) and "small areas of gliosis" related to "an old trauma or infarct" and the presence of "hypertensive arteriorsclerosis (MRI)." *Plaintiff's Brief* at 14 (*citing* Tr. 723-725).  However, given that studies were ordered in response to Plaintiff's claims of dizziness and headaches, the ALJ's summation of these imaging studies as "normal" is not

erroneous. The test results conclude that Plaintiff did not experience "significant stenosis, aneurysm, or arteriovenous malformation (MRA)" or "acute infarct or abnormal mass" (MRI) which would account for the allegations of dizziness and headaches (Tr. 723-725). Notably, an ultrasound of the carotid artery and an EEG, also taken in June, 2012, show unremarkable results (Tr. 721, 786). While Plaintiff disputes the ALJ's characterization of the MRA and MRI as normal, none of the subsequent treating records indicates that the imaging  studies resulted in more aggressive treatment.

Further, Plaintiff's allegations of dizziness, as recorded in the treating records, indicate that the episodes of dizziness were brief and happened on an intermittent basis only (Tr. 329). The  August, 2009 two to three-minute episode was attributed to dehydration (Tr. 375, 377). Plaintiff reported that he was dizzy only when arising from a bending or sitting position (Tr. 325, 327).  Plaintiff reported that the episodes did not last more than a few seconds and that he did not lose consciousness (Tr. 366, 567).  While Plaintiff later claimed at a May, 2011 appointment that he lost consciousness from both a sitting and standing position, he was advised to adhere to a low salt diet and schedule a followup appointment for six months  (Tr. (Tr. 475-476).  Followup notes by Dr. Ahmed state that the episodes of syncope had resolved (Tr. 771).  The ALJ's rejection of the professed limitations as a result of syncope, well supported and explained, do not provide a basis for remand.

## B.  The Abdominal Distention

Likewise here, the ALJ acknowledged and adequately discussed the condition of

-15-

abdominal distention.  The ALJ noted that imaging studies ordered in response to Plaintiff's claim of abdominal distention showed only mild or wholly unremarkable results (Tr. 92). The ALJ observed that a January, 2011 ultrasound showed only a slightly enlarged liver (Tr. 92).  As noted by the ALJ, a CT of the abdomen performed seven months later showed normal results (Tr. 92).  The ALJ observed that Dr. Shea found that the distention was attributable to Plaintiff's inconsistent use of diuretics (Tr. 93).  Consistent with Dr. Shea's finding, Plaintiff's treating cardiologist found in March, 2011 that Plaintiff was bloated because he failed to curtail his salt intake (Tr. 467).  While Plaintiff alleges fatigue as a result of the extra abdominal weight, the record shows that the condition resolved when he followed his doctor's medical advice.  SSR 96–7p, 1996 WL 374186, *7 (1996)(a claimant's failure to follow a prescribed plan of treatment can be used to undermine the allegations of limitation).  As such, the ALJ's finding that the allegations of limitation as a result of abdominal swelling were not credible should be upheld.

### C.  Discussion of the Non-Examining Sources

Last, Plaintiff faults the ALJ for adopting the May, 2010 Residual Functional Capacity Assessment performed by Dr. Digby (Tr. 400-403) while omitting mention of a second Assessment by Dr. Holmes performed in July, 2010 (Tr. 435-439).  *Plaintiff's Brief* at 16-17. Plaintiff notes that the finding that he could stand or walk for six hours in an eight-hour day (Tr. 400) as found by Dr. Digby differs significantly from Dr. Holmes finding that he was limited to walking/standing for *two* hours (Tr. 435).  *Id.*

-16-

Plaintiff is correct that the ALJ acknowledged and adopted Dr. Digby's findings but omitted mention of the July, 2010 Assessment.  Pursuant to 96–6p, 1996 WL 374180, *2 (1996), the ALJ is required to discuss the weight accorded to the State agency opinions. Nonetheless here, the ALJ's failure to mention the latter Assessment amounts to harmless error.  First, the hypothetical and RFC restrictions of "no prolonged walking" or "standing" do not contradict Dr. Holmes' finding that Plaintiff would be restricted to walking or standing about two hours a day rather than Dr. Digby's standard "exertionally light" finding that Plaintiff could stand/walk for six-hours in an eight-hour workday (Tr. 91, 133).  The VE's finding that the modifiers of "no prolonged walking" or "standing" would significantly limit the light work is reflected in his job finding of assembly work limited to "bench work in an non-manufacturing environment" (Tr. 133).

Further, substantial evidence supports the RFC for a limited range of light work. September, 2009 records state that Plaintiff was "physically active" (Tr. 323).  None of the records before the ALJ suggest that Plaintiff was unable to stand or walk for less than six hours in an eight-hour day.  Plaintiff's claims of chronic shortness of breath and lower extremity swelling and pain are unsupported by treating records or the imaging studies (Tr. 384, 425, 476, 784).  *See Murphy v. Commissioner of Social Sec.,*  2014 WL 2558685, *8 (E.D.Mich. April 30, 2014)(Grand, M.J.)(failure to discuss a non-examining opinion harmless error where substantial evidence otherwise supported the ALJ's determination); *Wafford v. Astrue,* 2008 WL 347688, *3 (E.D.Ky. Feb.6, 2008).

-17-

While the record shows that Plaintiff underwent a plethora of consultations and imaging studies to establish continuing disability, it weakly supports the claims. Plaintiff disputed the objective testing from 2009 forward showing that the cardiomyopathy was resolved (Tr. 448). While he sought second and third opinions regarding the cardiomyopathy, the later clinical and objective studies also showed unremarkable results (Tr. 470, 467, 476, 482, 625-626, 645). Contrary to Plaintiff's testimony that he lived with his sister and elderly mother and relied on them to perform all of his laundry and household chores (Tr. 113-114, 122, 128-129), the August, 2011 treating records state that he was currently living with his fiancée (Tr. 620). The ALJ's conclusion that Plaintiff's disability ended as of May 1, 2010 is well supported by the medical evidence and the transcript as a whole.

Because the ALJ's determination that Plaintiff was no longer disabled was well within the "zone of choice" accorded to the fact-finder at the administrative hearing, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

Accordingly, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 18, 2015

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was sent to parties of record on February 18, 2015, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager

-19-